UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
\- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. 1:24-mc-00013 |
| | : | |
| Petitioner, | : | **SHOW CAUSE HEARING** |
| vs. | : | |
| | : | 24th of January, 2025 |
| TATE JOHNSON, | : | 10:00 a.m. |
| | : | |
| Respondent. | : | |

\- - -

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE STEPHANIE K. BOWMAN, MAGISTRATE JUDGE**

\- - -

APPEARANCES:

For the Petitioner:

Michael R. Pahl, Esq.
US Department of Justice, Tax Division
PO Box 7238
Washington, DC 20044

For the Respondent:

Ralph William Kohnen, Esq.
Taft Stettinius and Hollister
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
and
Kevin F. Sweeney, Esq.
Chamberlain Hrdlicka, PA
300 Conshohocken State Road, Suite 570
West Conshohocken, Pennsylvania 19428

Also present: Elizabeth Walker, IRS Agent

Courtroom Deputy: Kevin Moser

Court Reporter: Lisa Conley Yungblut, RDR, RMR, CRR, CRC
United States District Court
100 East Fifth Street
Cincinnati, Ohio 45202

**Proceedings recorded in stenotype.**
**Transcript produced with computer-aided transcription.**

**PROCEEDINGS**

(Proceedings held in open court at 10:00 a.m.)

THE DEPUTY: All rise. This court is now in session pursuant to the adjournment, The Honorable Judge Stephanie K. Bowman, United States Magistrate Judge, presiding. Please be seated.

THE COURT: Good afternoon -- good morning, sorry, good morning. All right. Could I have counsel enter their appearance for the record, please?

MR. PAHL: Michael Pahl on behalf of the United States, Your Honor. Good morning.

THE COURT: Thank you.

MR. KOHNEN: Your Honor, good morning. Ralph Kohnen on behalf of the defendant -- or defendants, we'll see about that -- and my colleague, Kevin Sweeney.

THE COURT: Thank you. Good morning, Mr. Sweeney.

All right. So I've reviewed the pleadings in this case, and I guess let's for the record clarify the state of the summons as it relates to Mr. Johnson, either individually or not. So I understand there's an agreement that he did not have to be here today. Could the government just expand on that a little bit? Are you in fact seeking records from Mr. Johnson in his individual capacity? Just elaborate on that a little bit, please.

MR. PAHL: Yes, Your Honor, I think we'll clarify.

We've had some informal discussions with opposing counsel on this. We're not seeking any records from Mr. Johnson in his individual capacity; although, the Court needs to have personal jurisdiction over him because he resides within the district.

So the summonses are directed towards the two LLCs. He's just the person who's been served with them because he's an officer of the corporation, and he's also -- he also serves as the taxpayer representative, their partnership. So when they file their 1065 returns, they put his name down as the person to basically deal with the IRS, so, but he's not personally -- we're not saying his personal documents we are seeking; that he, as an officer of these entities, produce the documents of the entities, if that clarifies it for the record.

THE COURT: Thank you.

Mr. Kohnen, is there anything else that you want to add?

MR. KOHNEN: I'm going to introduce you to Kevin Sweeney and let him, if that's okay with you, to address that issue.

THE COURT: Thank you.

MR. SWEENEY: Just one point of clarification. I don't think that the summonses were issued to Mr. Johnson as an officer of the company, and that's just from a reading of

the summonses itself. I do agree that they were issued to him as partnership representative for each company.

THE COURT: So if I understand right, your position is that there is either a typo or the summons was not prepared correctly when it identified Mr. Johnson?

MR. SWEENEY: Kind of the converse of that, Your Honor. The summons is the summons. We think that sort of the way that the government is talking about it is not entirely correct. It's true, he is an officer of the company, it's just that that's not the capacity for which he was served.

THE COURT: Thank you. Do you want to address that issue at all, Mr. Pahl?

MR. PAHL: Yeah. I think that the best way to address that is, as we do the argument, when we're talking about Respondent, we're really talking about the companies responding to the summons through their officer who's been served with the summons. So I think that that goes to the summons is the summons. In other words, the Court needs to decide whether or not to enforce the summons, but it is ultimately seeking the documents of the company, but we've served their officer because it doesn't need to name him as an officer. It's just he is an officer of the corporation and he's been served, so we don't think that that's an issue, but I think that that's the clarification going

forward.

It just does get complicated because you have Johnson as an individual residing in Ohio. He's also a taxpayer. He's also the representative of the company, and he's also a corporate officer. So he has a lot of hats, but the issue is whether the company needs to produce the documents.

THE COURT: All right. Thank you.

Mr. Sweeney, would you agree that the companies have been properly served with the summons?

MR. SWEENEY: Yes, we agree that Tate Johnson as partnership representative for the company has been properly served. And I would just say that what Mr. Pahl just said, he again is referring to service of an officer, I don't think -- officer and partnership representative are not the same thing, so, you know, I just -- I don't think that that's accurate. And I think one of the issues here and one of the reasons I think it was sort of hard to sort through all of these issues is we talk about different capacities I think pretty fluidly, and I think it's important as we get into the actual issues here that we be precise as to who the summons is actually issued to, which is him in his partnership capacity.

The other thing I would note is that Ms. Walker's declaration I think says that he was served on Mr. Tate (sic) as an officer and taxpayer representative, which is

yet another capacity for which he was not served. So, you know, I think there's going to be a lot of parts of this hearing where we talk about the record and whether the record really kind of even puts us in a position where we can decide these issues with finality, but I do think it's important to clarify capacities because I think it affects a lot of things here.

THE COURT: Mr. Kohnen, do you have something else?

MR. KOHNEN: Judge, if I might be heard, and I'm not going to do this as a habit. I think the Court has identified a critical issue in this matter, and I know the Court is looking for an answer to the question it asked now, but I would respectfully ask you to maybe hold a decision on that until you've heard all of the stuff, because there's a lot of -- as you have already heard, there's a lot of nuance that comes with this.

THE COURT: Okay. Thank you.

All right. Mr. Pahl, how would you like to proceed today? Do you have an argument you would like to make?

MR. PAHL: Yes, I would just like to make a brief argument. Obviously, the parties have fully briefed the issues. The Court has, you know, read our -- read all of the submissions. I just wanted to highlight a couple of points for the Court's edification.

So this case is a 6700 investigation, which is a term

that we use in the IRS, and what it really means -- and it does reflect the institutional posture, that's the legal term that I think is important for the Court. The institutional posture of the IRS in 2024 is that they're looking into deferred legal fee arrangements as potentially abusive transactions. So, you know, this is a high-level investigation on behalf of the IRS and what it's looking into and can be derived just from 6700 itself which penalizes the making and furnishing of basically false statements about alleged tax benefits.

And it's important I think for the Court to understand that 6700 penalties are assessed per transaction. I like to analogize it basically saying like, if it were a drug deal, it would have to be 200 drug deals and they're all separate transactions. So in other words, you're not penalized just saying we think this is an illegal transaction. They have to penalize it for every separate transaction. So they would have to say, well, we need to look at the transaction that you took place with the Jones law firm, that would be Penalty 1, the next is the Smith law firm, and the next would be the Yungblut law firm, et cetera, et cetera, which is why these types of summonses by their very nature are going to be broad because they're going to go into the full course and scope of the business.

The Court doesn't have to get into what is a deferred

legal fee arrangement. I mean, it's not directly before the Court. I think it's directly before the Court in the sense that the IRS investigation has to at least be relevant under the Internal Revenue Code.

Basically, it starts with this case, *Childs*, which is an Eleventh Circuit case. And the easiest way to understand this -- and this comes from Brook Hollow's own website and their own promotion. Let's suppose, for example, you're doing a mass tort claim and you receive $10 million as part of your settlement. Well, the current marginal tax rates are 10 percent to 37 percent. If you're the attorney and after you've paid your client off, let's just suppose it's a third, and the rest of the money is coming in. Well, if it comes in to you and if you have constructive receipt of that income in that year, you'd be facing the highest marginal tax rate, 37 percent. But if you can defer it through some way, just as one would defer compensation as a regular employee, if you can defer it to a later date and not get paid essentially, it's not going to be treated as income in that tax year, you're not going to be subject to that marginal tax rate. And in *Childs* and other cases, certainly, there's facts and circumstances where those arrangements are legal.

The question is whether or not the taxpayer constructively receives the income in the year. So just

like when you have a deferred comp. arrangement, you say I took $10,000 and I said I don't want that now, I want it when I'm 70, and you'll be taxed on it when you're 70 hopefully at a lower marginal tax rate. It's a similar thing here.

What we have going on here, Brook Hollow Financial and Brook Hollow Capital, as by the very title of these LLCs suggests, is that there's some type of deferral of income and then there's some type of loan coming back. And so you can well imagine, if there's a loan coming back, money, there's actually money coming back to the plaintiff's lawyer, for example, and the question is -- the ultimate question is whether or not that is an abusive tax arrangement. This is early in an investigation. There's been no determination either way, but that's what the IRS is investigating.

And, again, going to the need for a broad summons, one can imagine if, if the primary -- if the primary participants in this are plaintiff lawyers who are in some cases, you know, making lots of money in a settlement in one year -- that's the nature of that practice, kind of, you know, a big kill and you make a lot of money -- there's a reason people would want to enter into these arrangements. And it's potentially -- that it's potential that they're abusive, and that's the purpose of this investigation.

A couple of other small points -- perhaps not small. There's no statute of limitations on a 6700 investigation, and this company has been around according to the website since 2007, so the IRS could examine, they could go back to 2007 if they wanted to. In this case, the summons is from 2016, so we are looking at fairly recent activity, but it is -- you know, it's a broad, it's a broad thing. Their website itself talks about that they have something like $400 million in transactions since they started their company. So this is not by any means what one would call a small outfit or some mom-and-pop arrangement, that's the reason why the IRS is looking into this.

Going into the real issues -- so we think we easily establish it's relevant, and the other side has a heavy burden to show that the IRS is acting somehow in bad faith. We think that can -- most of their argument can be pretty much summarized by the IRS issued several what are called informal document requests. They're just working with the taxpayer saying would you turn over documents informally without us having to go through a summons process. Nothing really happened as a result of that, and as a result of that, the IRS went and had to do a formal summons.

It's not bad faith for parties to disagree about whether or not and in what manner should documents should be produced, but it certainly doesn't make it a bad faith move

on the IRS when it's just trying to conduct its investigation.

There is one issue and this is -- this is an important one, again, because of some of this confusion that's created because of the many hats, individual, taxpayer representative, corporate officer, and Respondent. We do speak in our brief about whether or not there's been a Department of Justice referral, and what we have pled so far is inaccurate and incomplete, and we would ask to have seven days to amend, do a supplemental declaration. I'll explain why.

As we read through Respondent's brief and they were making a good point about, you know, being very exact with what entity we're dealing with, the statute that talks about the Department of Justice referral is not referring to the physical person who may have -- who has a legal duty to turn over the documents. It's actually referring to the summoned party in the sense of who has the documents. So we would need to amend to clarify that the two LLCs are not -- there's not been a DOJ referral regarding them. I can make a representation on the record today that we have received information that there is no DOJ referral. Received it from the IRS, but we would like to have it formally set forth in a declaration by an IRS Special Agent.

There's a 2022 Fourth Circuit decision -- it's not

binding on the Court, but it is instructive -- that the best practice would be in this type of situation to have the IRS Special Agent declaration. Importantly, in that case, they said in terms of an evidentiary issue, when the Court doesn't have, doesn't have any evidence before it to think that there is a DOJ referral, then, it's okay for the summons to go forward, and in this case, we're just trying to clean up that part of the record.

Most of the other arguments I think that are made are -- I kind of call them arguments that kind of always can be made with any type of request for production of documents or, in here, a summons case. And just to be clear, it's not -- we're not under the Rules of Civil Procedure, this isn't Rule 34, there aren't balancing tests. So we have objections made to things, like we say, well, you know, you need to give us a tax opinion letter. Well, why would we want to have a tax opinion letter? Well, we want to know did the entities go to a lawyer who said, you know, we've looked at this and we believe it's legal. And, of course, we also want to say what did you give the lawyer, what was the information the lawyer had in forming this opinion. Or, perhaps, there isn't a legal opinion and that may be relevant, too, as to knowledge under 6700.

So when we're asking for that -- and I think the summons includes some kind of language like including but

not limited to -- we don't view that as anything improper because the IRS is not in a position to know what documents they have. It's just saying, well, an opinion letter or I would just use same or similar type document, I don't think that that renders the actual request too vague to respond. And I think they can simply respond by saying here's what we have or here's what we don't have, and that's fine and we would have to address that later.

The second thing goes to the question of e-mails. And I don't think -- I think the issue comes up that again the Federal Rules of Civil Procedure don't apply, so the Court doesn't have to do a balancing test as if -- like let's suppose there's only a hundred thousand dollars at issue here and somebody said, you know, you've asked us for everything and we've gone out and found it's going to cost us $500,000 to respond to your request for production of documents. The Court would be in a position to say that's unreasonable and I'm not going to permit that under these circumstances. Here, the only evidence they've said is just an assertion by counsel that somehow they're a small company. A couple of responses to that.

There may only be a few people involved in the company. We don't actually know how many people are involved in the company. Anytime you're dealing with large financial transactions, you don't necessarily need tons of people. So

it's not a question of, you know, you're making widgets and need to have 500 employees. Maybe there's only five or six people, what does that mean by "small"? But there's really no evidence before the Court that the request itself is unreasonable just because it's costly. If they want to make that argument, they have to show the Court what's their net operating income, which is kind of interesting. When you go back to 6700, the penalties are determined by 50 percent of the gross income derived from the abusive transactions. So to complete that circle, if penalties ever do come up, it's going to be based on how much -- what's the gross income of the company. And now we have a situation where the company is saying, oh, this is going to be devastating to us financially, but they're not telling us what their gross income is as to why that would be.

The second problem with the e-mail approach simply goes to the fact that they want to have the IRS somehow agree to the search terms for what they're looking for. I'm always reminded -- because I also work in the criminal area -- like when you're doing a wiretap and you need to go to the court and say -- or, you know, just any type of search warrant and you may say, you know, somebody was out at Fifth and Vine speaking to an informant and they were talking about buying some tacos. Well, if you just submitted an affidavit saying somebody was talking about tacos, please let us do a

warrant, et cetera, a judge would say you're out of your mind. But if you turned around and said, well, actually, when they used "taco," it's actually a street term for cocaine in Cincinnati, then, it becomes relevant.

My point is we don't know what terms would reveal the evidence that we need and we don't want to rely on the persons we're investigating to tell us what the terms are because we don't know what their tacos might be. Instead, we just want them to produce what we asked for, and we'll look through the e-mails and we'll find out what's there, and we believe that's well within the scope of the 6700 investigation.

I don't have anything else for the Court, unless the Court has questions.

THE COURT: No, not at this time.

MR. PAHL: Thank you.

THE COURT: Thank you.

All right. Mr. Kohnen, Mr. Sweeney, who wants to respond?

MR. KOHNEN: Your Honor, Mr. Sweeney is going to make the bulk of the argument, but if the Court will indulge me, I'll do it from counsel table and be very brief. The one thing that we all have to keep in mind is that we all share the record in this case, the government, us, the Court. Through no fault of the Court at all, this record is

already a mess, and I think what you're going to hear is -- we've already now heard a request for more clarification from the government side. I think what you're going to hear from Mr. Sweeney in just a minute is some very good reasons why the Court really shouldn't, and perhaps even can't, proceed with a ruling today. But I'll leave that up to the Court and I'll defer to Mr. Sweeney.

THE COURT: All right. Thank you. Mr. Sweeney.

MR. SWEENEY: So, Your Honor, from our perspective, you know, we're here today because after being served with a summons, we made what we think were very valid, reasonable arguments and asked for a conversation on them. The things that we wanted to talk about were a lot of the types of things that Mr. Pahl just stood up and talked to the Court about. And I think he raises some good points, and he has some questions that could be resolved if the right people with the right attitudes tried to work together, got in a room and hammered it out. But the problem was, despite our repeated requests both before we got the summons, during the IDR process and after, we were refused that opportunity.

Now, our main issue is is the sheer breadth of what the IRS is asking for here, and I think that that's best demonstrated from three of their requests, No. 5, No. 6, and No. 21. And the good thing is these are requests that actually Mr. Pahl has already talked about so you might be

familiar with. 5 and 6 had to do I think initially -- and I think the focus of those are on tax opinions, and we have absolutely no issue with that, that part of the request, if that's really what the IRS is looking for.

The problem that we have with the request is that it seems that the government still sort of doesn't understand even after the briefing is not that. They talked about the including but not limited to language. If it was written a different way, we wouldn't have a problem with that language. We understand that summonses are often drafted with that language.

But I think the way Mr. Pahl talks about it is different than the way it's actually written. The way it's written is it asks for all -- and I don't have the exact wording in front of me, but essentially documents and records related to the program, including tax opinions. That's one of the things that we've been begging the IRS to talk to us about, but they wouldn't do it. And so today we're having a discussion in this courtroom where the IRS interprets this one way, we interpret it another way, and it might very well be that we both want the same thing and would be totally fine with it.

So if essentially what the IRS is asking for there was tax opinions and the like, and that's kind of what the including but not limited to is, we wouldn't have a problem

with that. Our problem is the way that it's drafted, we think that it asks for literally everything, and we think that that's probably the right interpretation of that. And if the government is telling us that that's not it, then, that's a great conversation and one that we want to have.

The other request that we think is sort of indicative of the broadness, and this is not withstanding the other 19, is the e-mail request, and Mr. Pahl brought up the fact that we didn't establish that essentially the company could not afford it. Okay. And it's a good point. We didn't do it because it wasn't really the gravamen of our issue. Our issue was really the broadness, but in demonstrating the broadness, we also wanted to demonstrate that it's a herculean task as well.

And included in our pleadings was a quote that we got for, you know, basically vendors to help us if we had to review all of the e-mails that the government would like us to review, and that quote that we got was for $1.1 million. And regardless of whether the company has $5 or $1 billion, I think any company would be concerned about that cost. And if it's stuff that the government truly needs, we understand that they have a right to conduct an investigation, we understand that they need to get documents to do that. What we currently don't understand is why they need every single e-mail.

And there is case law -- and I think we cited a case called *Coinbase* in our pleadings -- where courts have found that the combination of a really broad request and the absence of any information from the IRS about why they need all of that is an abusive process. And we think that there's an abusive process here because when we combined our interpretation of 5, 6 and 21, we think that it basically asks for almost every document involving these companies over a nine-year period. We understand they're entitled to a lot, we understand that the law allows a lot, but we think that that's just simply too much.

I think the other thing that sort of struck me when I read the government's pleadings is they're sort of -- we talk about the same events and we talk about them in different ways. The government talks about how they made good faith efforts, and I think we say the exact opposite. And I think if I were Your Honor, I would be wondering what the disconnect there is, and I think the problem is what is meant by "good faith effort." We sent letter after letter explaining what our positions are on this and that we really want to talk, and we were never given that opportunity.

Now, I suppose -- and I know actually based on their actions -- that the government was reading those and maybe they disagreed with them. In fact, we know they disagreed with them, but they never gave us a conversation about it.

And I think what Mr. Pahl sort of -- his presentation sort of brings to light is it seems like there might actually be common ground here that we would have been able to get into if we were given the chance and we weren't.

Now, to Mr. Pahl's credit, though -- and I want to be clear about this -- once we found out about this action, we reached out to him and he was receptive to a conversation about the substance of our arguments, and we were very pleased with that. We were happy, we thought we would be able to work something out. But as he said in his pleadings, that all ended after he talked to his client, who essentially insisted that we all come here today and sort this out before you.

Now, I understand this may happen in a case from time to time, but in my experience -- this is just my experience -- I have never experienced that before. Both when I was in the government and when I was on the defense side, every time that someone who receives a summons or a subpoena wants to have a conversation, I've either been given the opportunity or given somebody the opportunity. I think that makes this case unique. Now, I don't know what Ms. Walker does or what her practice is, and maybe she never gives that, but to me, that's unusual and that caused us to question, you know, whether the sort of intent of this was just to get the records or maybe was it something more.

And I think as things went on, sort of that sort of worrying concern grew, right. What we found is, even though we had raised some of these issues at the IDR process, when they issued the summons, it was clear that they were reading the arguments we were making but not giving us meetings about because they converted some of the issues that we had with new requests that were even broader and even more burdensome. Again, it's -- you know, individual by itself, there's nothing wrong with it, but it's the type of thing that starts to make you question.

Then, once we reviewed the pleadings in this case, what we found was that Ms. Walker's declaration was replete with things that just, you know, weren't accurate, and some of those made a big difference. I mean, one of the things that she said in her affidavit was that she issued the summons with respect to an investigation into Mr. Johnson. That's a serious allegation. It's also an allegation that's totally unnecessary and not consistent with the summons at all, and that had some longstanding -- will have long-lasting effects on our client. There were some articles that were published that referenced what was going on as an investigation into him concerning deferred legal fees. Being that we had concerns before, that just sort of magnified them.

And then there were some additional things in that declaration that just simply weren't true. For instance,

when we initially got the first IDR, we did make a production. Admittedly, that production was not everything, it wasn't even close to everything, and it wasn't meant to be everything. We had about three weeks to make that production. We made the things -- some things -- we made a production of things we thought the government would want and some things that were just easy for us to get the conversation going to have the discussion that we wanted to before that we're having today, but we were denied that.

And it became clear really early on in this case that the IRS wasn't going to budge, we were never going to get that conversation and that we were going to wind up here. And because that was the case, it didn't make sense for us to continue to produce because one of the things that you argue in a summons enforcement proceeding is that it shouldn't be enforced, and we thought that might be the case here. By making a production, that would essentially moot some of the arguments that we might make. So despite the fact that we wanted to resolve this, the fact that we wanted to get on with the substance of the investigation, the posture of the IRS made that difficult for us and ultimately resulted in us coming here today.

Now, those are the things that I think really -- we think causes us to question some of the IRS' motives in conducting this investigation and issuing these summonses,

but we think -- and through Mr. Pahl's argument, I think it's clear that he probably agrees -- that you don't need to reach those issues even to make a ruling that you can enforce the summons today. And I think there's two reasons for that.

The first is how Mr. Pahl pled the case, and we don't fault Mr. Pahl for that. Mr. Pahl was working off a declaration from Revenue Agent Walker that was inaccurate, and I think that that contributed to the way that he pled because the affidavit was geared towards Mr. Johnson, and, in turn, the pleadings seem to be geared towards Mr. Johnson as well.

But based on the Federal Rules, because jurisdiction in this case is only conferred on the Court -- subject matter jurisdiction is conferred on the Court with respect to the enforcement against a summons recipient, the pleadings need to make clear that the government is suing a summons recipient, and the pleadings don't make that clear, not in the caption, which is why we had the whole soliloquy in the beginning of this about who represents who and who got sued and what's this case really about, right, but it's not just about the caption.

The caption is not clear, the declaration is not clear, and because the caption and declaration are not clear, the substance of the pleadings is not clear as well. And so we

don't think that the government has established jurisdiction for the Court to even make a final ruling, and we don't think it can enforce the summons on that ground.

The second is an issue that Mr. Pahl raised himself, which is we don't think that they satisfied one of the necessary requirements for enforcing a summons and that's, you know, that they satisfy IRC 7206(D), which says that they can't issue a summons against somebody who's been referred to the Department of Justice. And Mr. Pahl is exactly right, it's not about who received the summons; that's not who the government needs to establish there's no referral against. Otherwise, every time Bank of America got a summons and if that somehow got enforced, you know, there would be proceedings about whether Bank of America was under investigation; the real person, right, or the real person that's being examined was the client or the customer of Bank of America.

The same thing is here, and so the pleadings are deficient there. We think that that's essentially black letter law. We agree with Mr. Pahl, but I think the one thing we disagree with -- or maybe we don't -- is that sort of fixing that alone is enough. We think the record in this case is, quite honestly, a mess.

To the government's credit, they fixed a lot of the issues with Ms. Walker's declaration I think in their

narrative in the reply, which we appreciate. But the problem and what it set up is essentially now we have government pleadings that contradict the declaration for which the entire case was brought, and that's really the only evidence that matters, and it's all of the evidence that the government is relying on in trying to enforce the summons. So there's a serious credibility issue that I think permanently prevents the summons to be enforced, but at a minimum, it prevents it from being enforced right now.

And I think it's important to narrow, to sort of just list off some of the things I think that are wrong with the record. So I think, first, in Revenue Agent Walker's declaration, she states that Brook Hollow Capital and Brook Hollow Financial and Mr. Johnson are under investigation, and the reply brief confirms that's not true. Only Brook Hollow Capital and Brook Hollow Financial were -- the summonses were issued only with respect to the investigations that were with regard to Brook Hollow Capital and Brook Hollow Financial.

Second, her declaration states that she has none of the summons documents in her possession. The government I think sort of tacitly admits that that's not true as well. I mean, a lot of the documents that they request are certainly not in their possession, and that's not what we're saying, Your Honor, but there are some that are. I don't know that

that matters as far as the substance, other than to say, you know, it makes us question sort of the veracity of the only evidence there is in this case.

And then sort of to the issue that we started with today, the declaration states that it was issued to Tate Johnson as the president and taxpayer representative of Brook Hollow Capital and Brook Hollow Financial, even though the summonses only state that the capacity for which he was served was partnership representative, which is neither of those things. And to be clear, in IRS speak, taxpayer representative is the person that represents somebody in an IRS proceeding, that that is actually a formal term, and it's different than a partnership representative, which is somebody who has sort of the legal obligation to be the point of contact for an entity with respect to an examination or an investigation.

And, you know, and then also the declaration states that all administrative steps have been followed, and, you know, sort of the next part of that is about the referral; but as we talked about, they've been speaking about sort of the wrong referral, and so the administrative steps actually haven't been followed. And so we think really in order for I think -- and what benefits everybody here I think is a clean record. All of these things need to be fixed.

And so to the extent the Court is not inclined to sort

of permanently and finally not enforce the summons, then, we think they should at least preliminarily decline to enforce the summons and require not just a new affidavit, but an affidavit -- a pleading that's consistent with that affidavit and a pleading that establishes subject matter jurisdiction to the extent the Court would be inclined to not permanently and finally decline to enforce the summons.

To the extent that the Court was inclined to enforce the summons, then, we would ask for the Court to narrow it and really just in four ways. And I want to make a point, too, because the government in their pleadings talk about the reason we couldn't have a conversation is because everything -- because of what we wanted was so drastic. And I think, you know, the effect of it could be drastic, right, of some of these things, but I think actually if we got in the room and actually talked about it, the effect of it is probably not as drastic as they think.

And I think one of the things that the government loses by having an attitude like conversations like that are like the fox getting into the chicken coop, which is what they said, is they lose the ability to have a conversation, one, that resolves issues; but, two, often results in them getting things that they want but didn't actually ask for. It's something that benefits everybody. It benefits the Court because they don't have to deal with issues like this.

And I think a great example of that is if you look at one of the exhibits that we sent with respect to our June IDR response, we noted some things that they asked for that they weren't entitled to, but we then said there are some things we can give you that we think that would satisfy what you're really looking for. And they've essentially deprived themselves of that and I think created additional work for everyone along the way.

The other thing I would encourage you to read, Your Honor, if you haven't already, is the letter we sent to Mr. Pahl because we put a lot of time into it and that letter sets forth what we want to talk about, and we think what we want to talk about is totally reasonable. And we think a reasonable government with the right motives and right intent would be at least receptive to a conversation, not necessarily agree with everything. Often in those conversations, we don't always agree to everything, and that's fine and that's the way it goes, but that's not what happened in this case.

So the four things that we would ask you to give I think really careful thought to narrowing are: 1, in our brief in the Relevancy section, we talked about a request, I believe it's Request No. 10, which demands records essentially concerning tax benefits and deductions, so statements that people from the company made about whether

people qualify for deductions or benefits or whatever.

That document is not qualified at all, and so the way we read it, right, if somebody is having a conversation about their 401(k), that's responsive. You know, if somebody is having a conversation about sort of like their personal rental, that's a responsive document. I don't even think that that's what the government intended when they drafted this, but, again, without being able to talk with them, we can't resolve these types of issues. So we would ask you to narrow that only to deductions and benefits that are related to the program that the government is investigating.

Second thing has to do with the time period of the overall summons. The summons asks for us to produce documents we think indefinitely, but the specific language is until the date of compliance. We think that that doesn't work for both legal reasons and practical reasons. The legal reason is that the legal rights and obligations of a summons are fixed as of the date that it's served, and so custody and control and possession is established then; it's not established after. And so they're asking for documents that are outside our custody, control, and possession under the law because they're asking for things that we've gotten after we were served with the summons.

But the practical reason why that doesn't work is it

creates an endless loop that we can never comply with if the government doesn't talk to us. So as an operating business, every day there are e-mails, every day documents come in, every day documents go out, but we can't comply with a summons in one day, right. It takes time to figure out what is responsive. We have to gather it, put it in the right format, we have to get it to them, that takes time. By the time we do that, we then have to start preparing to produce the things that we received in, you know, that time period between when we started trying to comply and when we complied, and that cycle would go on and on indefinitely and we would never be able to fully comply. I think in practicality, a request like that, besides I think being more than what the law even allows, practically is impossible and certainly way too burdensome.

The other two are two other -- well, three other ones are the three that we've already talked about, the two about the tax opinions and the one about the e-mails, and I'm not even sure -- and I'd be interested to hear from Mike Pahl on this -- whether there's a disagreement on that. When Mr. Pahl responded, you know, or replied to our response, he insinuated that the reason that we were contesting some of these is that we didn't want to provide tax opinions or say that we didn't have tax opinions. That's actually not our argument.

We're totally fine with responding to requests for tax opinions. Our issue is that we think that those requests ask for everything, and so if they don't ask for everything -- and I'm sorry that we had to get to a court to figure this out -- then, we would like to know about it. And if they do ask for everything, then, we think they're too broad.

And then finally is the e-mail issue, again, which we talked about. And I agree with Mr. Pahl, from an evidentiary standpoint, we didn't establish that the business is small. I don't think we necessarily needed to, that's why we didn't. Our point is that they're asking for essentially every e-mail over a nine-year period with no caveats, with no limitations, and that's going to cost a lot of money for us to comply with.

Now, that is one issue, right, that it's burdensome, but the other issue is it's just simply too broad. And again taking it back to the Coinbase case that says a broad request coupled with the IRS not being able to articulate what they would do with all of the information is an abusive process, and we think that that's an abusive process here.

In closing, I just wanted to explain our appendix to our response. What that was was essentially because, you know, in a normal case where you have an opposing party who'll talk to you, you talk through an issue. And if you

read the summons, Your Honor, which I'm sure you have, there's complicated definitions, it's very long, and, you know, it's the type of thing that you wouldn't expect to have to go through alone without being able to pick up the phone and talk through some issues. And if this Court is to order us to, you know, respond by enforcing the summons, I mean, we're going to do that, but right now, there are some things that we're not a hundred percent sure our position is going to align with the IRS.

So we just wanted to put everybody on notice about what our position was because no one would listen to us until now. And if these issues come up at a future date, I just -- we just want to be able to say that we've raised it and that we welcomed a discussion on it and no discussion actually came. You know, we just wanted that to sort of be our position and that's why we did it.

THE COURT: If I were to, I guess, go with what I'll call your alternative request and -- let me start over.

If I find it unenforceable, so I guess that would be your first request, if I find it unenforceable, would you expect the IRS to just turn around and issue a new summons and start the process over?

MR. SWEENEY: Well, I don't know. That's for them, but, to me, I think I would hope that they would learn something from this and that we would have a conversation

about it. I don't think that they're just going to go away and drop the investigation; that's not even what we want. We want to defend ourselves in our investigation because right now they think that there's a problem with this program and we don't think that there is. We look forward to that day.

I imagine that they would issue a new document request of some sort, but what I would hope, though, is that they would come talk to us and that we would be able to reasonably work this out and would not have to involve the Court a second time in those same issues.

THE COURT: Thank you.

MR. SWEENEY: Your Honor, just one last thing I think I forgot. In the alternative sort of argument where we said if the government -- if you're inclined to let them fix the errors, you know, to not enforce it preliminarily and let them fix the errors, just want to be clear there's actually three things that we would want there. One would be the affidavit to be corrected to be completely accurate; for there to be a pleading that's consistent with that declaration, and that fixes the personal jurisdiction issue; and I think the last would be, and to us is really the most important, is to not let that time go to waste.

We think that you should order us and the IRS to get together to see if we can obviate these issues without

another hearing and more discussion on these issues, which I think really could be resolved if reasonable eyes could get into the room and talk it out.

THE COURT: Thank you. That was actually my next step, I was going to ask Mr. Pahl if he wanted to reply or if he just wanted a room to talk because that's going to happen either before or after a reply.

MR. PAHL: Well, there goes my argument. I just wanted to address a couple of points that Mr. Sweeney has brought up; I think he had four. And so I guess my answer to your question is, I would like to reply to them, and, certainly, if I'm here and you want me to sit down with Mr. Sweeney in our district, we can talk right now, that's fine. But I wanted to, just so we know, like get the landscape.

So yeah, to the extent that the affidavit misstated, we think it's been amended by pleadings, but I think we're going to look into whether or not some type of, you know, supplemental affidavit might be appropriate here under those circumstances.

There's been some statement -- I think we dealt with this previously -- something about the IRS being in possession of the documents; and our position is, no, we're not. We asked you to produce documents in native format, discrete files, and you gave us a PDF, and so it's not responsive to what the summons asked for. That kind of goes

into something like the tax opinion. It's a brief. It's rhetoric to suggest, you know, why don't we -- why aren't you giving us a tax opinion or not. This has been a long time, and it appears that you're playing -- trying to play games with it, but it's not that important.

I think the issue, I think that -- I strongly believe the Court has subject matter jurisdiction. I strongly believe the Court has personal jurisdiction. And I strongly believe without having any case authority whatsoever that the caption of a matter does not affect subject matter jurisdiction, personal jurisdiction, and I think the answer to that lies in Rule 15.

I actually researched this Martin Luther King Day because I haven't found any case that specifically addressed it, but there are cases where they'll be called -- you know, I don't want to say United States versus Johnson -- United States versus Smith, where Smith is a person but Smith is also a corporate officer and Smith is also the sole owner of a corporation. And, yes, the summons is going towards the corporation, but it is captioned in the person's name. They're the person in the district that the Court is saying, you, you, Mr. Johnson, you have to do something.

So I'm not sure that we would have to amend. I don't know that it's inaccurate as currently pled. But I'll certainly -- you know, if we've got seven days to get the

DOJ supplemental in on the referral, that's something else we'll consider. I may ask opposing counsel would you object to some form of amendment under 15? I mean, we're trying to do the right thing and I think we're all in agreement on that.

MR. SWEENEY: Yeah, right.

MR. PAHL: I'm not willing to say that the Court doesn't have jurisdiction. So I'm only asking you if we could come up with a better caption, you wouldn't object to it?

THE COURT: You don't have to answer right now.

MR. PAHL: Yeah, we can talk.

THE COURT: Talk during your session.

MR. PAHL: We can talk about it later. So I think that that pretty much -- in terms of cleaning up the record, I think that that's what we can do here. I'm taking it from the Court's comments that you probably want us to sit down and chat.

THE COURT: I do. I do have another question for you.

MR. PAHL: Yeah.

THE COURT: At the beginning of your opening remarks, you talked about the institutional posture in 2024. Do you envision that posture changing in 2025?

MR. PAHL: I wouldn't have any knowledge or

information, No. 1. I think if I -- I don't even know if I knew that if I could disclose it because it would be -- I think it would be protected, investigatory. I think a different way to answer the question is, the IRS, they're going forward with this investigation. That kind of goes to your comment of or the question of if you invalidated the summons, what would happen; another summons would come out, yes.

THE COURT: Okay.

MR. PAHL: We're not going home, if that's helpful.

THE COURT: All right. Thank you. I think I've made it clear that I want the parties to talk. You know, I wish you would have done so prior to coming here today, but since everyone is here, we can clear the courtroom and you guys can have it until 1:00. If you are still -- well, 12:45, the marshals will come in and do a sweep. If you're still talking, I can probably get you another room. If you want a conference room just to start with, I can probably get you one of those as well, if you don't want to stay in the courtroom.

I would ask after your conversations today each side file a supplemental brief limited to five pages just telling me what's been resolved and what the current -- it could be joint or it could be separate depending on where you guys land, but just telling me what the outstanding issues are.

And, let's see, today is January 24th, so I'll take suggestions. How much time do you think you need to have these discussions today? My hope is everyone is here, you can talk about most, if not all, of the issues and may not be able to come to resolution to them, but at least --

MR. PAHL: United States, we're here for the whole day. I don't know their schedule.

MR. SWEENEY: I'll be here, I can be here until 1. I mean, I can change my flight too.

THE COURT: Sorry, I didn't ask my question clear. How much time do you need to file supplemental briefs?

MR. SWEENEY: Just one sort of general issue, Your Honor. I think a lot of what we're going to talk about I think is fairly discrete. The one that I think is a little bit harder is the e-mails, in part because typically when I've done this in the past, right, you try to figure out search terms for the first ones that you find sometimes that don't work for sometimes one side or all sides, and so it's a little bit of, you know, trying things out and seeing what works and doesn't work to try to get it down to a population that works. So in my experience, that tends to take quite a while as opposed to some of the other ones which I think are more discrete that I'm hopeful we can hammer out today.

THE COURT: Okay. Mr. Pahl, do you have a suggestion on briefing deadline? I'll tell you I'm thinking

sometime in February, whether that's the 14th or the 21st.

MR. PAHL: I was just thinking off the top of my head 30 days just to be safe. One thing I did yesterday just to make sure, my agent has full authority to decide the scope of the summons, so whatever we work out here today can be -- if we can work something out here, we're here, we can work it out.

THE COURT: Okay. That's helpful. All right. So supplemental briefs will be due by February 21st, I'll give you approximately 30 days, little less, limited to five pages each.

The other thing is, I'll just give you a preview, I think the e-mail request is too broad. So when you're talking, let's try to limit it, okay?

All right. So if you need something, I'll be here. I will be on the bench from 1 to 2-ish and then I do have to go out of town this afternoon. So if you need me I'll be available until 1. All right. Thank you.

THE DEPUTY: All rise. This court is in recess until 1:00 p.m.

(Proceedings concluded at 10:58 a.m.)

**C E R T I F I C A T E**

In accordance with 28 U.S.C. Section 753, I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter prepared from my stenotype notes and that the transcript page format is in accordance with the regulations of the Judicial Conference of the United States.

*/s/* Lisa Conley Yungblut *02/06/2025*

LISA CONLEY YUNGBLUT, RDR, RMR, CRR, CRC DATE